**Norman C. TROBAUGH, Personal Representative of the Estate of Julia Trobaugh, deceased, Appellant,**

v.

**Terry A. TROBAUGH, et al., Respondents.**

No. C2–86–482.

Court of Appeals of Minnesota.

Dec. 9, 1986.

Review Denied Feb. 13, 1987.

Gordon I. Sinclair, Sinclair and Pardee, St. Paul, for appellant.

Alan W. Weinblatt, Weinblatt & Nadler, P.A., St. Paul, for respondents.

Heard, considered and decided by CRIPPEN, P.J., and LANSING and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Appellant Norman Trobaugh, the personal representative of the Estate of Julia Trobaugh, sought to evict respondents Terry and Genevieve Trobaugh from the former residence of Julia Trobaugh. Respondents countered by claiming that before her death Julia Trobaugh conveyed to them a life estate in her house.

The trial court found that Julia Trobaugh had intended to and did convey a life estate in her house to respondents by execution of a writing dated November 29, 1984. The court further found that Julia Trobaugh was mentally competent at the time she wrote the note. Appellant moved for amendment of the trial court's findings, vacation of judgment, or a new trial. Appellant argued that the disputed writing

was ambiguous and insufficient to convey any interest in decedent's house, that the decision in *In re Estate of Trobaugh*, 380 N.W.2d 152 (Minn.Ct.App.1986) was res judicata as to respondents' present claim, and that hearsay evidence had been improperly admitted. The court denied appellant's motions and this appeal followed. We reverse.

## FACTS

Appellant brought an unlawful detainer action against respondents. Respondents claimed at trial that Julia Trobaugh intended to and did in fact transfer a life estate in her house to them by execution of a signed writing. The parties introduced conflicting evidence as to their relationship with Julia and her intent as to the disposition of her house.

Respondent Terry Trobaugh testified that he had a close relationship with his grandmother Julia Trobaugh. He visited her and helped her cut grass, shovel snow and get groceries. Julia felt close to respondent because he had experienced financial difficulties similar to those suffered by her and her husband. Respondent claimed Julia had said she wanted her house used by a family member in such a financial situation. At that time Julia knew he needed and wanted her house. Respondent further testified that he and his wife Genevieve had several conversations with Julia in which she asked them to come live with her. He indicated Julia was afraid her son Norman Trobaugh would place her in a nursing home. To avoid this she stated that if respondents would live with and take care of her she would give them the house. Respondent testified, "We didn't want to do that. We told her that the only way we would move in is if we had a contract for deed and if she so desired, she could forgive the balance of that in a while, but we wanted some legal documentation. We wanted something that was going to protect her as well as us."

In September of 1984 respondents moved in with Julia Trobaugh, despite the fact that Julia did not sign the contract for deed

prepared for her. They still live in the decedent's house. According to respondent Terry Trobaugh, he and his wife cared for Julia after they moved in. Eventually Julia was hospitalized because of problems with her hip. Respondent stated that during visits to the hospital she again manifested the intent that respondents have her house.

Appellant testified that on November 25, 1984, after Julia had been released from the hospital to Harmony Nursing Home, he prepared a letter for Julia to sign. He stated that he explained to Julia that her house needed to be sold to pay her medical expenses and that, consequently, respondents had to move out. The letter directed respondents to move out of Julia's house so it could be sold to pay her medical expenses. She signed a letter that day that read as follows:

November 25, 1984

Terry & Jenny Trobaugh

Because of my injury and hospitalization and having to have 24 hour care I will have to sell my house as soon as possible.

I am sorry, but you will have to move out of my house by December 31, 1984. I know I told you both you could stay until Spring, but now that is not possible. I love you both,

(Signature)

Mrs. Julia Trobaugh

(Signature of Sue Koppy R.N. as Witness)

Appellant described respondent Terry Trobaugh's reaction to the letter as angry and threatening. Appellant stated that Julia started to cry at respondent's outburst.

Respondent Terry Trobaugh indicated that the day after he received this letter Julia stated to him that Norman Trobaugh had told her to sign the letter. He testified, "She said she was sorry that she had signed it and that she wanted us to stay there and not to let anybody tell us any different." Respondent further testified that Julia reiterated this intention a day later.

On November 29, 1984 respondent prepared a writing for Julia which she signed. It read as follows:

11/29/84

To Whom It May Concern,

It is my wish that Terry and Genny Trobaugh be able to purchase my house at 38 W. Hawthorne Ave. As planed (sic) on a Contract for Deed.

It is also my wish that Terry and Genny Trobaugh be able to live at my house untill (sic) the property is sold, or as long as they wish, if they do not intend to purchase.

(Signature)
Julia Trobaugh

_____

Witness

It is upon this writing that respondents' based their claim to a life estate in Julia Trobaugh's former residence. Respondents argue that Julia intended to and did convey to them, through execution of the November 29th note, a life estate in her house.

Respondent Genevieve Trobaugh testified and corroborated much of respondent Terry Trobaugh's testimony. Additionally, Julie Trobaugh and Cheryl Wilzbacker, also Julia's grandchildren, testified that Julia had said that she wanted respondents to have her house.

Appellant Norman Trobaugh disputed respondents' characterization of their relationship with Julia Trobaugh and their interpretation of the November 29th letter. He testified that the weekend after respondents moved into Julia's house she complained about their presence there and stated that she wanted them to move out. She voiced a number of complaints, including that respondents were eavesdropping on her telephone conversations and that they were leaving her alone in the house too often. Appellant also testified that Julia complained about respondents' disobedience concerning certain "house rules" and that respondents had not fed her regular meals. Additionally, after Julia received copies of a will and contract for deed, prepared by an attorney, she called appellant.

Appellant testified, "She says, 'I have some papers and I don't want to sign some papers.' With further discussions she said that she had papers she had to sign for Terry to buy the house and that she didn't want to sign them, and I told her, 'Please, don't sign anything until I come over.'" After finding that the papers were a contract for deed to respondents, appellant advised Julia not to sign them. Julia never signed the will or the contract for deed.

The attorney testified that he had prepared a will and contract for deed for Julia Trobaugh, but that neither were returned to him executed. He also testified that Julia had called him and said that "her grandson had pulled a fast one * * * and that everything was off."

Appellant maintained that Julia Trobaugh did not intend to convey any interest in her house to respondents, exhibited by the letter of November 25th requesting them to leave the house so it could be sold, and that the note of November 29th was insufficient to transfer any interest in the house to respondents. The trial court ultimately found that Julia Trobaugh intended to and did convey a life estate in her house to respondents by execution of the note dated November 29, 1984.

## ISSUE

Was the disputed writing insufficient as a matter of law to operate as an inter vivos conveyance of a life estate in the decedent's house to respondents?

## ANALYSIS

Respondents claim the November 29, 1984 note signed by Julia Trobaugh operated as an inter vivos transfer of a life estate in her house to them. They argue that although the note was ambiguous, properly admitted parol evidence established Julia Trobaugh's intent to convey her home. We disagree.

Initially we reaffirm that interpretation of the language of an instrument should be guided by the ascertainable intention of the parties. *Republic Nat'l Life Ins. v. Lor-*

*raine Realty Corp.,* 279 N.W.2d 349, 354 (Minn.1979). It is a well settled general rule that where the intention of the parties may be gained wholly from the writing the construction of the instrument is a question of law for the court to resolve. *Donnay v. Boulware,* 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). Where the language is ambiguous resort may be had to extrinsic evidence. *Id.* at 44, 144 N.W.2d at 716. Construction then becomes a question of fact unless the evidence is conclusive. *Id.* Yet, if the language used in an instrument is too doubtful for any settled construction, parol evidence cannot be received to create an agreement, as opposed to interpreting an existing one. 32A C.J.S. *Evidence* § 959(3) (1964); *see Levy v. Levy,* 130 Wis.2d 523, 388 N.W.2d 170 (1986). This determination is a question of law; no deference to trial court's findings is required. *Janssen v. Johnson,* 358 N.W.2d 117, 120 (Minn.Ct.App.1984). The note upon which respondents base their claim to decedent's house falls into this last category.

We find that the signed note dated November 29, 1984 insufficient as a matter of law to act as an inter vivos transfer of a life estate to respondents. The note on its face is too uncertain and contradictory to yield any discernible meaning. No amount of parol evidence could rectify this fundamental deficiency.

The disputed note itself is merely two contradictory sentences. The first sentence appears to indicate Julia Trobaugh wished respondents be able to purchase her house on a contract for deed. The second sentence is open to a variety of constructions. This sentence provides that respondents "be able to live at my house until the property is sold, or as long as they wish, if they do not intend to purchase." Whether any conveyance of a property interest was intended by her is unclear. Assuming decedent did intend some conveyance, it is impossible to tell what type of interest she meant to convey. Furthermore, the fact that decedent did not draft the instrument herself and appeared confused when she signed it does little to alleviate the intrinsic inadequacy of the instrument.

We note that this is not a case in which one ambiguous part of a complete contract, deed or will is being interpreted. The November 29th writing stands alone as the sole basis upon which respondents base their claim. This distinguishes the present case from the cases cited by respondents. Respondents rely heavily on *Thompson v. Baxter*, 107 Minn. 122, 119 N.W. 797 (1909) and *Grueber v. Lindenmeier*, 42 Minn. 99, 43 N.W. 964 (1889). In both cases ambiguous language in a deed was interpreted as a conveyance of a life estate. *See Thompson*, 107 Minn. at 123, 119 N.W. at 797 ("while he shall wish to live in Albert Lea" created life estate); *Grueber*, 42 Minn. at 101, 43 N.W. at 965 ("free use and privilege" created life estate); *see also Brown v. Brown*, 180 N.C. 433, 104 S.E. 889 (1920); *Gunnison v. Evans*, 136 Kan. 791, 18 P.2d 191 (1933). In all these cases the instruments at issue were either deeds or wills. The language interpreted was part of larger instruments.

In *Thompson* and *Grueber* there was no question that some conveyance had taken place, the issue was exactly what interest had been conveyed. Such is not the case here. The disputed writing here is not part of a contract, deed or will and there is nothing in the writing that establishes any kind of conveyance or bequest. The questionability of the disputed note's legal significance is highlighted by the fact that respondents originally claimed it was a contract to make a will. *See In re Estate of Trobaugh*, 380 N.W.2d 152 (Minn.Ct.App. 1986). Additionally, had Julia Trobaugh lived, it stretches the imagination to think that this incoherent note could have been used to evict her from her home because she has conveyed a life estate in the house to another.

### DECISION

The disputed writing was insufficient as a matter of law to operate as an inter vivos conveyance of a life estate in the decedent's house to respondents.

Reversed.