257 Minn. 222 (1960)
100 N.W. (2d) 758
IN RE APPLICATION OF WALDO T. MARECK TO REGISTER TITLE.
WALDO T. MARECK
v.
FREDERICK A. HOFFMAN AND OTHERS.
MILES LORD, ATTORNEY GENERAL, APPELLANT.
No. 37,787.
Supreme Court of Minnesota.
January 22, 1960.
*223 Miles Lord, Attorney General, and William M. Serbine, Assistant Attorney General, for appellant.
Van Valkenburg, Blaisdell & Moss, for respondent.
KNUTSON, JUSTICE.
This is an appeal from an order and decree of registration of title to certain land.
The land involved in this title registration proceeding consists of a part of what is now platted as Lots 3 to 10, inclusive, of Block 1, Arden Park Second Addition in the village of Edina. In an earlier plat, the land involved in this proceeding was designated as Block 14, Browndale Park. Lots 3 to 10 of Block 1 of Arden Park Second Addition are now platted as residential lots but are as yet undeveloped. The lots vary in depth from approximately 100 feet to approximately 120 feet and extend southerly from West Forty-fourth Street in the village of Edina. They abut on the southerly end upon residential lots in the Country Club District, Brown Section. There is no street or alley between the southerly end of these lots and the lots upon which they abut. For many years the southerly 100 feet of Lots 3 to 10 comprised the right-of-way of the Minneapolis & St. Paul Suburban Railway Company running westerly from the city of Minneapolis to the city of Hopkins. The tract of land involved in this proceeding, then platted as Block 14, Browndale Park, is a strip of land about 1,000 feet in length, having a maximum width of 18 to 20 feet near the center and tapering to a point at each end. This narrow strip of land lay between the streetcar right-of-way and West Forty-fourth Street in the village.
*224 Browndale Park was platted in 1909. At that time both the streetcar right-of-way and West Forty-fourth Street (which was formerly a county road) were laid out and in use. The strip involved here, lying between the streetcar right-of-way and West Forty-fourth Street, was not of an appropriate size or shape to be used as a residential lot, as was the rest of the addition. It was given a block designation, number 14, but was without lot separation or designation. The plat contains no dedication or designation of any sort as to any public character or restricted use of Block 14, nor does any such limitation appear in subsequent conveyances until the year 1919.
On June 24, 1919, Frank R. Hubachek, the then owner, conveyed Block 14 to Duncan R. McNaught and Frank M. Nye by deed. This deed contained the following provision:
"This conveyance is made upon the express condition and covenant that no building or structure of any nature or kind, except it be used for public park purposes, shall ever be erected upon the land and premises above described and in the event of a breach of this condition and covenant, the said land and premises are to revert to the parties of the first part, their heirs and assigns."
Frank M. Nye later conveyed his interest to McNaught, so he is no longer involved in this proceeding and will not be mentioned herein.
On July 15, 1929, Duncan R. McNaught and his wife, by quitclaim deed, conveyed Block 14, Browndale Park, to the village of Edina, its successors and assigns. This deed contained the following provision:
"* * * in trust, nevertheless, to have, hold, administer and maintain the same as a public park; and the grantee will not use the said land or suffer it to be used for storage or dumping purposes or for a filling station or for the sale of merchandise or other thing; and if said land shall cease to be a public park or shall be used for storage or dumping purposes or for a filling station or for the sale of merchandise or other thing, the title thereto shall revert to the above named grantor, Duncan R. McNaught, his heirs or assigns."
No formal acceptance of such conveyance by the village has been *225 shown in the record, but thereafter until 1956 the property was carried on the tax rolls as "exempt."
It was stipulated at the trial that the village intermittently cut the grass on said tract in accordance with its normal practice wih reference to other lands owned by the village. There is no record of expenditures made with respect to the tract other than that involved in the labor of intermittently cutting the grass. Some native shrubbery and a few lilac bushes were allowed to grow upon the property along a fence line separating this strip from the streetcar right-of-way, but no witness could recollect any cultivation thereof or the planting of any flowers on the property. In later years, rubbish occasionally accumulated on this strip of land.
Following the conversion of the Twin Cities transportation system to buses, the streetcar right-of-way was abandoned and was acquired by one W.N. Carlson, applicant's predecessor in title. Early in 1955 applicant commenced negotiations for the purchase of the former right-of-way for residential development. Since Block 14 blocked access to West Forty-fourth Street from the right-of-way, its acquisition became necessary in order to develop the rest of the land for residential purposes.
On December 27, 1955, Emma McNaught, widow of Duncan R. McNaught and one of the grantors in the 1929 deed to the village of Edina, for a consideration of $1,000 paid by applicant, executed a quitclaim deed to the village of Edina covering the land here involved.
On March 14, 1956, Frank B. Hubachek, as successor in title to Frank R. Hubachek and Nellie A. Hubachek, his wife, the grantors in the 1919 deed to McNaught, for a consideration of $1,000 paid by applicant, executed with his wife a quitclaim deed to said land running also to the village of Edina.
On April 23, 1956, the village of Edina, by quitclaim deed, for a consideration of $250, conveyed its interest in said property to applicant, subject to the alleged defects hereinafter discussed.
The present registration proceedings were commenced on May 3, 1956. The attorney general, acting under M.S.A. 501.12, answered *226 asserting that a trust existed as to Block 14 in favor of the public and that the village was without authority to convey said property. The issue came before the title examiner of Hennepin County, acting as referee, and, after hearings thereon, he found that applicant was the owner in fee of the property and recommended that the title to the property be registered in his name. The findings of the referee were adopted by the trial court, and an order and decree of registration were issued, from which this appeal is perfected.
It is the principal contention of the attorney general that the deed executed by McNaught and his wife to the village of Edina in 1929 created a charitable trust under § 501.11 and that the village was without authority to convey this property in the manner in which it was conveyed. Other questions incidental to this principal question will be discussed hereinafter.
1-2. The referee and the trial court found that the deed from McNaught to the village of Edina in 1929 created either a determinable fee with a right of reversion reserved in Duncan R. McNaught in the event that the grantee ceased to use the land embraced therein as a public park or permitted the land to be used for storage or dumping purposes or for a filling station or for the sale of merchandise thereon, or a fee simple on condition subsequent that the title thereto would revert to Duncan R. McNaught upon his exercise of a right of reentry in the event of a violation of any of the conditions therein enumerated. The distinction between the two is not material in this case.[1] It is this finding that is principally assailed by the attorney general.
At the outset, it is clear that the deed from McNaught to the village contains language consistent with the creation of either a charitable trust or a determinable fee or a fee simple upon a condition subsequent. Thus, it follows that an ambiguity exists in the deed giving rise to the application of rules of construction in the proper interpretation thereof for the purpose of ascertaining the intent of the parties.
*227 In Lawton v. Joesting, 96 Minn. 163, 166, 104 N.W. 830, 831, we said:
"The language of this deed is ambiguous to such an extent as to call for the construction and interpretation of the court. * * * Rules of construction are brought into requisition only for the purpose of ascertaining the intention of the parties, where that intention is not made clear by their written contract."
We followed with approval the expression of the applicable rules found in Grueber v. Lindenmeier, 42 Minn. 99, 100, 43 N.W. 964, 965, where we said:
"* * * Technical rules of construction are not favored, and are not to be so applied as to defeat the intention of the parties; for, as was said in Witt v. St. Paul & N.P. Ry. Co., 38 Minn. 122, (35 N.W. Rep. 862,) such rules of construction, in modern times, have given way to the more sensible rule, which is, in all cases, to give effect to the intention of the parties, if practicable, when no principle of law is thereby violated. Too much stress is not to be laid on the grammatical construction or forms of expression used. The cardinal rule of construction is to ascertain and give effect to the intention of the parties to the instrument; and, to this end, the court must consider all parts of it, and the construction must be upon the entire deed, and not upon disjointed parts. And, if the language is ambiguous, resort may be had to evidence of the surrounding circumstances, and the situation of the parties, if necessary, in order to throw light upon their intention."
3. It is true that the deed now under consideration uses language consistent with the creation of a trust. In Schaeffer v. Newberry, 235 Minn. 282, 288, 50 N.W. (2d) 477, 481, we said:
"* * * It is axiomatic that no particular form of words or conduct is necessary to create a trust. Neither the word `trust' nor `trustee' is required."
It is also true that use of the words "trust" or "trustee" does not necessarily create a trust.[2]
*228 4. A gift may have a charitable purpose and yet not constitute a charitable trust. In the Schaeffer case we said (235 Minn. 286, 50 N. W. [2d] 480):
"* * * a gift may have a charitable purpose and yet not constitute a charitable trust. To create a charitable trust of realty by will, it is also necessary that the testator manifest an intention that the transferee shall hold the gift subject to an equitable duty to serve the charitable purpose. Thus, a breach of trust does not result in destruction of the devise, but instead gives rise to an action against the trustee, which in Minnesota is enforced by the attorney general. On the other hand, where it clearly appears that the testator intends that the res shall revert to himself or his heirs if the charitable purpose is not served, the devise is not a charitable trust, but is construed as some type of absolute or conditional gift."
In Restatement, Trusts (2 ed.) § 11, comment a, we find the following:
"The owner of property may transfer it, inter vivos or by will, to another person and provide that if the latter should fail to perform a specified act his interest should be forfeited. In such a case the interest of the transferee is subject to a condition subsequent and is not held in trust."
The referee said in his memorandum:
"* * * It appears to your Referee that although McNaught used the words `in trust' and `public park' in his deed, he did not thereby intend that such land was to vest in accordance with the strict legal meaning of such words, but used them in a loose sense with the idea that the Village might, if such land ceased to be useful as a barrier between the street car right-of-way and the homes to the north thereof, dispose of said land to `its assigns' if the disposition thereof would inure to the betterment of the neighborhood and the Village."
5. So it is readily seen that, while the grantor did use language consistent with the creation of a charitable trust, he also provided that the title should revert to him if the property ceased to be used *229 for a public park or if it was "used for storage or dumping purposes or for a filling station or for the sale of merchandise or other thing." It is thus apparent that the reversion clause came into being for reasons other than mere abandonment of the property for park purposes. The habendum clause runs to the village, "its successors and assigns." Use of the work "assigns" is inconsistent with the creation of a charitable trust inalienable by the village. A possibility of reverter is one of the common characteristics of a terminable fee.[3]
It would seem that the distinction between a charitable trust and a conveyance on a conditional fee lies mainly in the duties of the trustee or the grantee. In the case of a charitable trust, the trustee assumes an affirmative duty to use the property in accordance with the trust. In the case of a conditional fee, the grantee has permissive right to use as directed and he may lose the title if he departs from such use. Aside from intermittent cutting of grass on this strip of land by the village, the evidence fails to show that the village used it for park purposes at any time. Some shrubbery, including a few lilac bushes, were permitted to grow on the strip, but there is no showing that any of such shrubbery was ever planted by the village. No effort was made to beautify the strip in any way, and in later years some refuse was permitted to accumulate thereon. Rather, it was used only as a buffer between the streetcar right-of-way and the street.
While the use to which the property was put may not be conclusive as to the nature of the conveyance, it is a factor which the court could take into consideration in determining the intention of the parties at the time the conveyance was made. The property then was not suitable for use for residential purposes because of its size and shape and its close proximity to the street and streetcar right-of-way. However, it is reasonable to assume that when the strip was conveyed to the village the grantor reserved the right to have it back in the future in the event that it became usable by virtue of abandonment of the streetcar right-of-way, if the village did not then make use of it as a park or violated *230 the other restrictions contained in the deed, and that the village accepted the property on such conditions. We think that the evidence amply sustains the findings of the referee and court that the conveyance did not create a charitable trust but that the title conveyed to the village was a fee subject to a condition subsequent or a determinable fee.
The attorney general relies for the most part on Consolidated School Dist. No. 102 v. Walter, 243 Minn. 159, 66 N.W. (2d) 881, 53 A.L. R. (2d) 218. The language used in the deed in that case is not distinguishable from that used in the present case. However, there, as here, we did recognize the rule that in a deed of such nature, which is ambiguous on its face, the intent of the grantor should be determined from the deed (243 Minn. 162, 66 N.W. [2d] 883, 53 A.L.R. [2d] 222) "and in light of the surrounding circumstances." The evidence in that case pertaining to the size and nature of the land, its intended use, and the circumstances under which the conveyance was made is distinguishable from that involved in this case. In a case involving a determination of the intent of a grantor, each case must rest on its own facts.
6. The attorney general has raised other questions of some importance to the bench and bar which involve issues not pertinent to the purpose for which he appears in this litigation. The attorney general appears here by virtue of § 501.12[4] solely for the purpose of enforcing a charitable trust as the representative of the beneficiaries thereof, which in this case are the members of the public. If there is no charitable trust, there is nothing for the attorney general to enforce, and other defects in the title proceeding are no concern of his. However, one of the questions raised has been argued without objection, and it is of sufficient importance so that we shall briefly dispose of it.
*231 It is the contention of the attorney general that prior to the enactment of L. 1937, c. 487, § 2, which amended M.S.A. 500.16,[5] possibilities of reverter were inalienable under the laws of this state; hence that the deeds from Emma McNaught and Frank B. Hubachek and his wife passed nothing to the village. We have heretofore held that prior to the 1937 amendment of § 500.16 possibilities of reverter were inalienable under the laws of this state.[6] Under the common law, however, such possibilities of reverter could always be released to the holder of the fee simple conditional.[7]
7. Here the quitclaim deeds from Emma McNaught and Frank B. Hubachek and wife ran to the village, the tenant of the fee simple conditional. The quitclaim deeds operated as a release of the possibility of reverter. The common-law form of release often included the terms common in modern times to a quitclaim deed. In 2 Reeves, Real Property, § 1045, we find the following:
"* * * the quit-claim deed of to-day is an outgrowth of the common-law release, and quite generally fills its office in modern transactions."
It is undoubtedly true that the quitclaim deed of today is used for purposes other than that of releasing such interests, but that does not prevent its use also as a release. Even as far back as Coke upon Littleton, Lib. 3, c. 8, § 445, we find the following definition of words used in a release:
*232 "Know all men by these Presents, That I A. of B. have remised, released, and altogether from me and my Heires quiet claimed: or thus, For mee and my Heires quiet claimed to C. of D. all the right, title, and claim which I have, or by any meanes may have, of & in one messuage, * * *. And it is to be understood, that these words, Remisisse & quietum clamasse, are of the same effect as these words, Relaxasse." (Italics supplied.)
For an exhaustive discussion of the subject, see In re Vine Street Congregational Church, 20 Ohio Dec. 573, holding that an ordinary quitclaim deed is effective to release such interest. See, also, Atkins v. Gillespie, 156 Tenn. 137, 299 S.W. 776, holding that a quitclaim deed by the heirs at law of the grantor to the holder of a fee conditional or determinable releases the right of reverter and vests the absolute title in the holder of the conditional or determinable fee.[8]
We therefore hold that the quitclaim deeds from the heirs of the holder of the possibility of reverter to the village released such rights of reverter and vested fee simple absolute title in the village. In view of such holding it is unnecessary for us to determine whether L. 1937, c. 487, permits assignment of rights of reverter created prior to the enactment of this act.
Other assignments of error, more technical than meritorious, not argued in appellant's brief, are deemed to be waived. They relate largely to procedural matters not involved in a determination of the question of whether a charitable trust was created or not. It is difficult to see how the attorney general could have been prejudiced in the trial of the only issue in which he was concerned on account of matters which do not affect the trial or determination of such issue.
We find no reversible error.
Affirmed.
NOTES
[1] "The practical distinction between the two rests largely in their manner of termination." Consolidated School Dist. No. 102 v. Walter, 243 Minn. 159, 162, 66 N.W. (2d) 881, 884, 53 A.L.R. (2d) 218, 222.
[2] Connecticut Junior Republic Assn. Inc. v. Town of Litchfield, 119 Conn. 106, 174 A. 304, 95 A.L.R. 56; Fayette County Board of Education v. Bryan, 263 Ky. 61, 91 S.W. (2d) 990.
[3] Schaeffer v. Newberry, 235 Minn. 282, 50 N.W. (2d) 477; Longcor v. City of Red Wing, 206 Minn. 627, 289 N.W. 570.
[4] The portion of § 501.12, subd. 3, giving the attorney general the right to appear in a proceeding of this kind, reads:

"* * * The attorney general shall represent the beneficiaries in all cases arising under this section and it shall be his duty to enforce such trusts by proper proceedings in the courts." See, Schaeffer v. Newberry, 227 Minn. 259, 35 N.W. (2d) 287; In re Estate of Quinlan, 233 Minn. 35, 45 N.W. (2d) 807.
[5] Section 500.16 now reads:

"Expectant estates are descendible, devisable, and alienable in the same manner as estates in possession; and hereafter contingent rights of reentry for breach of conditions subsequent, and rights to possession for breach of conditions subsequent after breach but before entry made, and possibilities of reverter, shall be descendible, devisable, and alienable in the same manner as estate in possession." (The italicized portion was added by L. 1937, c. 487, § 2.)
[6] Consolidated School Dist. No. 102 v. Walter, 243 Minn. 159, 66 N.W. (2d) 881, 53 A.L.R. (2d) 218; see, Fraser, Future Interests, Uses and Trusts in Minnesota, 28 M.S.A. pp. 53, 56.
[7] Fraser, Future Interests, Uses and Trusts in Minnesota, 28 M.S.A. pp. 53, 56; Gray, The Rule Against Perpetuities (4 ed.) § 14: "This possibility of reverter was inalienable; but it could be released to the tenant of the fee simple conditional."
[8] See, also, Brill v. Lynn, 207 Ky. 757, 270 S.W. 20, 38 A.L.R. 1109, with Annotation at 1111.